**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**FEDERAL TRADE COMMISSION,**

          **Plaintiff,**

-vs-                                        **Case No. 6:11-cv-1186-Orl-28TBS**

**DIRECT BENEFITS GROUP, LLC; VOICE NET GLOBAL, LLC; SOLID CORE SOLUTIONS, INC.; WKMS, INC.; KYLE WOOD; and MARK BERRY,**

          **Defendants.**

_____

## ORDER

The Federal Trade Commission ("FTC") filed the instant action alleging violations by the Defendants of § 5(a) of the Federal Trade Commission Act ("FTCA"),[1] 15 U.S.C. § 45(a). The FTC contends that Defendants engaged in unfair billing practices and failed to disclose material information on websites that they operated. The case is currently before the Court on the Motion for Summary Judgment (Doc. 130) filed by the FTC. Having considered the parties' submissions,[2] the Court denies the FTC's motion.

### I. Background

The Defendants in this case are Kyle Wood ("Wood"), Mark Berry ("Berry"), WKMS, Inc. ("WKMS"), Direct Benefits Group, LLC ("Direct Benefits Group"), Solid Core Solutions,

---

[1] 15 U.S.C. §§ 41-58.

[2] The pertinent filings are: (1) the FTC's motion (Doc. 130); (2) Defendants' Opposition (Doc. 154) thereto; and (3) the FTC's Reply (Doc. 159).

Inc. ("Solid Core"), and Voice Net Global, LLC ("Voice Net Global"). At times relevant hereto, Wood was the sole owner and officer of WKMS, an online payday loan referral service. (08/11/11 Wood Decl., Doc. 38, ¶ 3). Wood was also the sole owner and manager of Direct Benefits Group, an online marketer of discount savings products called Direct Benefits Online and Unified Savings. (Id.). Berry, a software engineer, was the sole owner and manager of Solid Core and Voice Net Global. (08/10/11 Berry Decl., Doc. 39, ¶ 3). Voice Net Global was an online marketer of long distance discount savings products, and Solid Core provided software development, operations, administrative, and customer services for Direct Benefits Group, WKMS, and Voice Net Global. (Id.). Wood and Berry and their companies worked closely with one another. (Doc. 38 ¶ 3; Doc. 39 ¶ 3).

The payday loan referral business of WKMS was started in December 2008. (Wood Dep., Doc. 134, at 12). WKMS had several websites on which customers could fill out a loan application; WKMS would then send that information to lenders or intermediaries who would find an interested lender to make a payday loan to the customer. (Wood Dep. at 25). Pursuant to contracts, the lenders and intermediaries paid WKMS a fee ranging from $1 to $100 for the information on the loan applicants. (Wood Dep. at 26-27, 29). Thus, consumers were charged nothing by WKMS for the lending referral. (Doc. 38 ¶ 5).

In July 2009, seven months after WKMS began its payday loan business, Wood started a membership discount club business called "Direct Benefits Online." (Wood Dep. at 22, 36). A membership in Direct Benefits Online cost $39.95 per month; later, Direct Benefits Online became "Unified Savings" and the membership fee was charged annually at a rate of $99.99. (06/13/12 Wood Decl., Doc. 154-1, at 1). These discount clubs offered

services including medical benefits, "daily deals," dining coupons, everyday coupons, travel deals, rebates, and long distance telephone service.  (Id. at 2-3).  Voice Net Global offered long distance and Internet services for a monthly fee.  (Berry Dep. at 18, 19).  Sometime in 2010, the name was changed to "Thrifty Dial" and the fee was charged annually instead of monthly.  (Id. at 24-25).

Consumers could sign up for Defendants' discount programs through WKMS's payday loan application websites,[3] and the manner in which consumers were enrolled in these programs on the websites is the subject of this lawsuit.  On WKMS's websites, consumers filled out payday loan applications; in doing so, they provided financial information, including bank account numbers.  After consumers completed their online applications, the websites then presented them with offers for Defendants' discount programs through banner ads and pop-up windows.  If consumers knowingly or unwittingly enrolled in the programs after filling out the loan applications, debits for the discount programs' monthly or annual fees were made from the bank accounts listed by the consumers in their payday loan applications.  Defendants maintain that consumers could not be enrolled or charged without affirmatively agreeing to being enrolled and charged, but the FTC claims that Defendants misled consumers and debited their bank accounts without their consent.

The FTC initiated this suit on July 18, 2011, by filing a complaint, an ex parte motion for a temporary restraining order ("TRO") with an asset freeze, and an application for

---

[3]These websites included citywestfinancial.com, mypaydayangel.com, paydaypickup.com, juniperloans.com, northcitymutual.com, southcitymutual.com, and mycashpickup.com.

appointment of a receiver.  (See Docs. 1, 4, & 11).  The next day, the Court entered a TRO, appointed a receiver, and scheduled a preliminary injunction hearing for July 28, 2011.  (See Doc. 15).  The parties jointly moved to continue that hearing while discussing the possibility of settlement, (see Doc. 22), and the hearing accordingly was rescheduled for August 18, 2011, (see Doc. 23), and was held on that date, (see Mins., Doc. 73; Hr'g Tr., Doc. 197).

At the hearing, the parties advised the Court that they had been unable to reach an agreement as to injunctive relief; while the Defendants were willing to agree to cease their practices without admitting wrongdoing, they would not agree to an asset freeze.  (See Hr'g Tr. at 2-4).  The parties then presented argument and demonstrated the operation of the subject websites.  The next day, the Court entered an Order granting a preliminary injunction in favor of the FTC, finding that there was good cause to believe that the Defendants had engaged in acts and practices violative of Section 5(a) of the FTCA and that the FTC was likely to prevail on the merits of the case.  (Doc. 71).  The FTC now moves for summary judgment, relying in large part on the evidence that it submitted in support of its earlier motions for preliminary injunctive relief.  The FTC seeks broad permanent injunctive relief and disgorgement of over $9.5 million for consumer redress.

## II.  Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  However,

when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1263 (D. Kan. 2003) (quoting Anderson, 477 U.S. at 251-52).  Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### III.  Discussion

Section 5(a) of the FTCA, 15 U.S.C. § 45(a), provides in pertinent part that "unfair or deceptive acts or practices in or affecting commerce[] are . . . unlawful."  In Count I of the Complaint, the FTC alleges that the Defendants engaged in unfair billing practices in violation of this section by obtaining consumers' bank account information and debiting those accounts without the consumers' consent.  And, in Count II, the FTC alleges that the Defendants engaged in deceptive acts in violation of this section by failing to adequately disclose material information.

"An unfair practice does not require knowledge of consumer harm and may merely

'facilitate, or contribute to, ill intentioned schemes if the injury was a predictable consequence of those actions.'" FTC v. Wells, 385 F. App'x 712, 713 (9th Cir. 2010) (quoting FTC v. Neovi, Inc., 604 F.3d 1150, 1156 (9th Cir. 2010)). "To be 'unfair,' a practice must be one that '[1] causes or is likely to cause substantial injury to consumers [2] . . . is not reasonably avoidable by consumers themselves and [3] [is] not outweighed by countervailing benefits to consumers or to competition.'" FTC v. Accusearch Inc., 570 F.3d 1187, 1193 (10th Cir. 2009) (numbering alteration in original) (quoting 15 U.S.C. § 45(n)).

Moreover, "[a] practice is deceptive under the [FTCA] if 'it is likely to mislead consumers acting reasonably under the circumstances . . . in a way that is material.'" FTC v. Grant Connect, LLC, 827 F. Supp. 2d 1199, 1214 (D. Nev. 2011) (quoting FTC v. Cyberspace.Com LLC, 453 F.3d 1196, 1199 (9th Cir. 2006)). "'A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures." Id. (quoting Cyberspace.Com, 453 F.3d at 1199). "While proof that consumers actually were deceived is not required, such evidence is 'highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances.'" Id. at 1215 (quoting Cyberspace.Com, 453 F.3d at 1201). A § 5 violation "only requires a showing that misrepresentations 'possess a tendency to deceive.'" FTC v. Commerce Planet, Inc., No. 8:09-cv-01324-CJC(RNBx), 2012 WL 2930418, at *17 (C.D. Cal. June 22, 2012) (quoting Trans World Accounts, Inc. v. FTC, 594 F.2d 212, 213 (9th Cir. 1979)).

The FTC has presented evidence of numerous consumer complaints regarding Defendants' discount program enrollment. For example, the FTC has submitted declarations of consumers who state that after applying for a payday loan, they noticed charges on their

bank statements that they did not recognize. These consumers deny ever seeing advertisements for memberships in a discount program when completing the payday loan applications and deny enrolling in the programs. In many instances the consumers were able to obtain refunds of the charges from Defendants.

Additionally, Better Business Bureaus throughout the United States received consumer complaints regarding enrollment in Defendants' programs. It is also undisputed that Defendants received complaints directly by email and telephone. State Attorneys General also received complaints, as did an unrelated company called "Direct Benefits, Inc." of St. Paul Minnesota, which received at least 1800 complaints during an eighteen-month period beginning in early 2010. There is also evidence that the FTC also received more than 70 consumer complaints. Moreover, Wood has acknowledged that Defendants' programs had a 70% return rate. (See Wood Dep. at 117).

Defendants maintain that the consumers who were enrolled in the programs without realizing it simply did not read the instructions and disclosures on the websites. Defendants assert that no consumer could be enrolled in the programs without affirmatively checking a box or at least clicking an "okay" button in response to a directive, and thus they argue that consumers could have avoided enrollment if they had paid attention. Defendants also note that most of the payday loan applicants who used WKMS's website did not enroll in the discount programs—showing, in their view, that the disclosures were clear to reasonable consumers. Defendants contend that their businesses were legitimate and that their discount programs were valuable to consumers. Additionally, Defendants dispute the significance of and inferences to be drawn from their return rates, and they argue that the

-7-

FTC is using an incorrect comparator return rate.

As another district court has noted, the "Court's role in evaluating evidence in the context of summary judgment is markedly different than in the context of a bench trial." FTC v. Ross, Civil Action No. RDB-08-3233, 2012 WL 2126533, at *4 (D. Md. June 11, 2012). "A judge does not sit as a trier of fact when deciding a motion for summary judgment even if the case is scheduled to be heard without a jury." Id. (internal quotation and citation omitted). Here, as in Ross, "[n]otwithstanding that the FTC's evidence is substantial, at this stage in the litigation[] th[e] Court is unable to conclusively determine whether the FTC is entitled to summary judgment." Id.

There are numerous factual issues remaining for trial. For instance, the parties dispute to some extent the content and operation of the websites and the possibility that consumers could enroll in Defendants' programs without taking affirmative steps to do so. Additionally, the parties dispute the appropriate comparator "return rates" and the significance of Defendants' return rates. Importantly, the matter of the appropriate amount, if any, of monetary relief is also hotly contested; this has been the main point of contention throughout this case, and the Court cannot resolve it on the summary judgment record. In sum, all issues will be determined by the Court following a bench trial, and the FTC's motion for summary judgment is denied.

### IV. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. The Motion for Summary Judgment (Doc. 130) filed by the Federal Trade Commission is **DENIED**.

2. This case remains set for a bench trial. As scheduled by prior notice, (see Doc. 195), the trial will commence on Tuesday, November 27, 2012.

3. If the parties reach a settlement of this matter, they shall advise the Court immediately.

**DONE** and **ORDERED** in Orlando, Florida this 7th day of November, 2012.

_____
JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record