# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**FEDERAL TRADE COMMISSION,**

        **Plaintiff,**

**-vs-**                                **Case No.  6:11-cv-1186-Orl-28TBS**

**DIRECT BENEFITS GROUP, LLC; VOICE NET GLOBAL, LLC; SOLID CORE SOLUTIONS, INC.; WKMS, INC.; KYLE WOOD; and MARK BERRY,**

        **Defendants.**

_____

## MEMORANDUM DECISION AND ORDER

The Federal Trade Commission brought this action seeking injunctive and monetary equitable relief against four corporate entities and two individual Defendants, contending that the Defendants engaged in unfair and deceptive practices in violation of § 5(a) of the Federal Trade Commission Act[1] by debiting consumers' bank accounts without their consent and by failing to disclose material information on websites that they operated.  After the FTC's motion for summary judgment was denied, (Doc. 198), the case proceeded to a bench trial, (see Trial Trs., Docs. 213-216).[2]  The parties thereafter submitted written closing

_____

[1]Section 5(a) of the FTCA is codified at 15 U.S.C. § 45(a).

[2]Citations to the trial transcripts will be denoted in this Order by the day of the trial followed by the page number.  The transcript of Day 1 is Doc. 213; for Day 2 is Doc. 214; for Day 3 is Doc. 215; and for Day 4 is Doc. 216.  Thus, for example, "Tr. Day 1 at 2" denotes the second page of the transcript of Day 1—Doc. 213.

arguments and proposed findings of fact and conclusions of law.[3]

Upon consideration of the evidence and testimony presented, argument of counsel, and the parties' proposed findings and conclusions, I issue the following opinion in accordance with Federal Rule of Civil Procedure 52.  I conclude that the FTC has met its burden of proving by a preponderance of the evidence that the Defendants engaged in unfair and deceptive practices in violation of § 5(a); that the individual Defendants are liable for the corporate violations; and that the Defendants operated as a "common enterprise" such that each is liable for the acts of the others. Injunctive and monetary equitable relief will accordingly be granted.

## I.  Factual and Procedural Background

The FTC is an independent agency of the United States Government created by statute—the FTCA, 15 U.S.C. §§ 41-58.  The FTC enforces § 5(a) of the FTCA, which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC is authorized to initiate, by its own attorneys, federal district court proceedings to enjoin violations of the FTCA and to secure such equitable relief as may be appropriate in each case.  See 15 U.S.C. §§ 53 & 56.

Defendants WKMS, Inc., and Solid Core Solutions, Inc., are Utah corporations with their principal places of business in Bluffdale, Utah.  Defendants Direct Benefits Group, LLC, and Voice Net Global, LLC, are Wyoming limited liability companies with their principal places of business in Bluffdale, Utah.

---

[3](Docs. 218, 219, 220, & 221).  The parties were permitted to file objections to each other's submissions, but neither side did so.  (See Mins., Doc. 208; Tr. Day 4 at 3-4).

Defendant Kyle Wood is the sole owner and officer of WKMS and is also the sole owner and manager of Direct Benefits Group.  (Tr. Day 3 at 109; Wood Decl., Pl.'s Ex. 104). Wood described WKMS, which he founded in December 2008, as an online payday loan referral service and Direct Benefits Group as an online marketer of membership clubs called Direct Benefits Online and Unified Savings that offered various discounts and rebate opportunities to their members.  (Tr. Day 3 at 109; Pl.'s Ex. 104; Wood Dep., Pl.'s Ex. 47, at 12).  Wood created Direct Benefits Group in July 2009 in order to sell the membership club products.  (Tr. Day 3 at 18; Wood Dep. at 7-8, 22).

Defendant Mark Berry, a software engineer, is the sole owner and manager of Solid Core, a software development and staffing company that he formed in January 2009.  (Tr. Day 3 at 161-62; Berry Decl., Pl.'s Ex. 52).  Berry is also the sole owner and manager of Voice Net Global, which he described as a company that provides dial-through long-distance service. (Tr. Day 3 at 164-65, 184; Pl.'s Ex. 52).  Voice Net Global also did business under the name "Thrifty Dial."  (Id. at 188, 189).  Wood and Berry operated their companies out of office space that they shared in Bluffdale, Utah.

WKMS operated several websites on which customers could fill out payday loan applications.   These websites included, among others, citywestfinancial.com, mypaydayangel.com, paydaypickup.com, juniperloans.com, northcitymutual.com, and mycashpickup.com.  WKMS did not provide payday loans but instead was a referral service; after a customer completed online loan applications, WKMS sent the customer's information to lenders or to intermediaries who would find a lender interested in making a loan to the customer.  (Wood Dep. at 25).  Over its three-year existence, WKMS received 2,908,576

loan applications and placed 594,956 applications with lenders. (Tr. Day 3 at 111 (Wood Test.)).[4]

Each of the discount programs—Thrifty Dial, Voice Net Global, Direct Benefits Online, and Unified Savings—offered long-distance service; members were provided with an 800 number and a PIN code, after which they could make long distance phone calls for the price of the membership fee. (Tr. Day 3 at 34 (Wood Test.); Defs.' Ex. 26). Direct Benefits Online and Unified Savings included additional features. Wood described some of the other benefits of these programs as rebate opportunities, travel vouchers, coupons, "daily deals," and medical discounts. (Tr. Day 3 at 21-22). Only the rebates section required Direct Benefits Group to pay something—aside from startup costs—in order to produce a benefit to the customer; customers could mail in a rebate form and a receipt from a specified retailer, and Direct Benefits Group would send the customer the indicated rebate amount. (Id. at 25-27). The other available discounts were discount vouchers, compilations of coupons, or lists of products for sale obtained by an electronic feed, and it did not cost Direct Benefits Group anything if a customer used one of those products. (Id. at 30).

After mid-2009, consumers could sign up on WKMS's payday loan application websites for one of the discount programs. In the course of filling out payday loan applications on WKMS's websites, consumers provided financial information, including bank account numbers for the account where the desired payday loan was to be deposited.

_____

[4]As explained by Wood, the lenders and intermediaries paid WKMS a fee ranging from $1 to $100 for the information regarding the loan applicants, and consumers were not charged anything by WKMS for the lending referral.

During the loan application process, the websites presented the consumers with offers for the discount programs through banner ads and pop-up boxes.  If consumers knowingly or unwittingly enrolled in the programs in the course of submitting their payday loan applications, debits for the discount programs' monthly or annual fees were made from the bank accounts listed by the consumers on the payday loan applications.  Initially, the discount programs were offered at a monthly fee ranging from $39.95 to $59.90.  However, sometime in 2010, Wood came up with the idea to change from a monthly fee model to an annual fee model, (Tr. Day 3 at 189 (Berry Test.)), and the memberships then were offered—and bank accounts then were debited—for annual fees ranging from $98.40 to $99.90.

These debits sometimes came as a surprise to consumers, who often had not realized that they had enrolled in a discount program rather than merely submitting a payday loan application.  Additionally, the debits sometimes resulted in bank overdraft charges for the consumers; those who had not realized they had enrolled were not expecting such a charge, and many of these payday loan seekers did not have enough money in their bank accounts to cover the debits.  When consumers discovered debits from their bank accounts that they did not recognize, they typically contacted their banks or the Defendants or made complaints to Better Business Bureaus ("BBBs") or government entities, including the FTC. The FTC began investigating the matter in the spring of 2011 and filed this lawsuit in July 2011.  Contemporaneous with the filing of its Complaint, the FTC sought and was granted a temporary restraining order with an asset freeze, and a receiver was appointed.  (Doc. 15). A month later, a preliminary injunction was entered, (Doc. 71), and the case proceeded to

trial in November 2012.

During the trial, the FTC presented testimony from thirteen witnesses—eight consumers, two FTC investigators, a Minnesota business owner, a banker, and the receiver who was appointed shortly after the filing of this case.  Defendants presented the testimony of two witnesses—individual Defendants Wood and Berry.  Both sides also submitted many exhibits into evidence.

II.  Website Operation and the Enrollment Process

The manner in which the payday loan websites and advertisements for, and enrollment in, the discount clubs on those websites operated is largely undisputed and was demonstrated at trial primarily during the testimony of FTC Investigator Reeve Tyndall. Tyndall explained his investigative activities regarding the Defendants, including three "undercover buys" that he conducted in April and May 2011 by applying online for payday loans and enrolling himself—using a secret identity—in the discount club memberships. Tyndall explained that after reading some consumer complaints, he approached the buys by "trying to be objective to see how the process worked from beginning to end."  (Tr. Day 1 at 117).  His goal was "to incur a charge" because the FTC knew that consumers were incurring charges after they submitted payday loan applications.  (Id.).  Tyndall took "screenshots" of what happened as he engaged in the undercover buys and, using software, he also recorded videos of each undercover buy.  (Id. at 117-18; Pl.'s Exs. 35, 38-39, & 89-91).

For the first undercover buy, Tyndall went to mypaydayangel.com on April 7, 2011. (Id. at 117, 119-20).  The landing page contained a graphic that said "Get cash up to $500

as soon as **1 hour**!" and promised "Easy to Apply – Approved in Minutes – Cash in Your Account." (Id. at 121; Pl.'s Ex. 35 at B1).  Nothing on the landing page mentioned a discount club or long-distance phone service.  (Tr. Day 1 at 121; Pl.'s Ex. 35 at B1).  Tyndall selected the desired loan amount—$500—from a dropdown menu and then filled out the payday loan application.  (Tr. Day 1 at 122; Pl.'s Ex. 35 at B2).  The application required entry of information including name, address, social security number, employment, checking account number, bank name, and routing number.  (Tr. Day 1 at 123; Pl.'s Ex. 35 at B3).

At the end of the application was an advertisement for Thrifty Dial's long distance service.  (Tr. Day 1 at 122, 124; Pl.'s Ex. 35 at B4).  The Thrifty Dial advertisement included a "check box," which was not checked by default, and accompanying text:

> **IF BOX IS SELECTED BELOW**
> I have read and understood, and agree to all terms of this offer, including charges for **$98.40** which includes 1 year of access to the services of Thrifty Dial.  Yes, I want a year of services!  ☐

(Pl.'s Ex. 35 at B4; Tr. Day 1 at 124).  Tyndall left the box unchecked[5] and then clicked an orange "Submit Application" button on that page.  (Tr. Day 1 at 124; Pl.'s Ex. 35 at B4).  After Tyndall hit the Submit button, a pop-up box appeared on the screen.  (Tr. Day 1 at 124; Pl.'s Ex. 35 at B5).

Tyndall first noticed two buttons in the pop-up box—"OK" and "Cancel"—and the OK button appeared to be highlighted in blue.  (Tr. Day 1 at 124; Pl.'s Ex. 35 at B5).  In the pop-

---

[5]As correctly noted by the FTC, no evidence was presented at trial regarding any consumer purchasing the subject products by checking the box in the original banner advertisement.  (See Pl.'s Closing Argument, Doc. 221, at 3 n.2).  The focus of the case was on enrollment that occurred via the pop-up box after the "Submit Application" button was clicked without the banner ad box being checked.

up box above the OK and Cancel buttons was a block of text that read:

> ATTENTION:
>
> Read below before pressing OK
>
> Press OK to submit your loan application and still take advantage of Thrifty Dial. By pressing OK, you agree you have read and understood and accept all terms for this cash advance offer, as well as all terms for Thrifty Dial, which includes a 1 year usage account for a single charge of 98.40, which provides access to services of all benefits described in the terms and conditions.
>
> By pressing cancel, you still understand and accept all terms of this cash advance offer, but do not wish to buy Thrifty Dial today.

(Pl.'s Ex. 35 at B5).   Tyndall read through the text a couple of times to make sure he understood it; he did not understand it at first and had to read through it again.  (Tr. Day 1 at 125).   Tyndall explained that "[a]t first, it seemed a bit counterintuitive, and it was something that I wasn't expecting. . . . [A]t first, I thought it was maybe terms and conditions or something related to the payday loan application; but once I read it through a few times, I began to realize that it was related to the Thrifty Dial upsell." (Id.).  Tyndall "was confused by the pop-up box"; he was not expecting it based on his initial investigation.  (Id. at 127).

Tyndall reiterated that the choices appeared to be counterintuitive, explaining that he "think[s] of a pop-up box as sort of like a fork in the road where you can choose to go down one direction or another direction. . . . [His] first reaction to [the OK and Cancel buttons] was [that] OK would continue [him] down the path that [he] had already taken . . . [and that] cancel [would mean] stop the application process." (Id.).  Tyndall felt like the instruction to "read below before pressing OK" was pushing him toward the OK button.  (Id. at 128).  After reading the text in the pop-up box several times, however, he began to realize that pressing

OK would change his previous choice not to buy Thrifty Dial and that cancel "would actually continue [him] down the path that [he] had already taken of . . . not wanting the upsell." (Id.).

Ultimately, Tyndall pressed the Enter bar to continue, understanding that the enter bar would select the default option—the OK button.  (Id. at 125, 128).  Tyndall was then taken to another page that read in part:  "We are currently finding the best lender match for your loan application. . . . Your business is important to us.  Please review our email that will be sent to you.  Please check your inbox and spam folder."  (Pl.'s Ex. 35 at B6; Tr. Day 1 at 125).  After this first undercover buy on mypaydayangel.com, Tyndall's undercover checking account was debited $98.40 for the Thrifty Dial product—consistent with his intention, on instructions from his manager, to buy something through the process.  (Tr. Day 1 at 126 & 130).

Tyndall conducted a second undercover buy on April 15, 2011, on the citywestfinancial.com website.  (Id. at 132).  Similar to his first buy, in the second buy Tyndall completed a payday loan application, again selecting a $500 loan amount and providing bank account information.  (Id. at 132-33; Pl.'s Ex. 38 at E1-E2).  On that application was an advertisement for the Unified Savings product and an unchecked "check box" and message similar to the Thrifty Dial check box and message:

SELECT BOX BELOW!

I have read and understood, and agree to all terms of this offer, including charges for **$99.90** which includes 1 year of access to the services of Unified Savings.  Yes, I want a year of benefits!  ☐

(Pl.'s Ex. 38 at E2-E3; Tr. Day 1 at 133-34).  Tyndall left the box unchecked and then clicked the green "Confirm" button on the page.  (Tr. Day 1 at 134).

After Tyndall hit the Confirm button, two things occurred—first, the screen automatically scrolled to the top, and second, a pop-up box appeared.  (Id. at 134).  At the top of the page was a yellow dialogue box that stated:  "Congratulations, please confirm the information below.  Submit to begin your loan process."  (Id.; Pl.'s Ex. 38 at E5).  The pop-up box—like the pop-up box in the first buy—contained two options, "OK" and "Cancel."  (Tr. Day 1 at 134; Pl.'s Ex. 38 at E5).  It contained similar wording as well:

ATTENTION:

Read below before pressing OK

Press OK to validate your loan application and still take advantage of Unified Savings.  By pressing OK, you agree you have read and understood and accept all terms for this cash advance offer, as well as all terms for Unified Savings, which includes a 1 year usage account for a single charge of $99.90, billed to the bank account you have provided today, which provides access to services of all benefits described in the terms and conditions.  You will still need to confirm your sign up for Unified Savings by leaving the box checked upon submission.  Pressing OK will only check the box for you on the application.

By pressing cancel, you still understand and accept all terms of this cash advance offer, but do not wish to buy Unified Savings today.

(Pl.'s Ex. 38 at E5).  Tyndall read through the text in the pop-up box a few times because it was slightly different from the pop-up box in the first buy.  (Tr. Day 1 at 135).  After doing so, he clicked "OK," and he was taken to a page that told him to "wait while we search our cash provider network," (Pl.'s Ex. 38 at E6), and then to a page that said:  "Thank you! Congratulations!  We have found several offers for loans or other services in which you may be interested," (Pl.'s Ex. 38 at E7; Tr. Day 1 at 135).

On May 17, 2011, Tyndall conducted his third "undercover buy," again on

citywestfinancial.com.  (Tr. Day 1 at 136).  He completed the payday loan application and encountered an advertisement for Unified Savings with the unchecked check box and "select box below" message he had seen during his second buy.  (Id. at 137; Pl.'s Ex. 39 at F2). Tyndall again left the box unchecked and clicked the green "Confirm" button.  (Tr. Day 1 at 137; Pl.'s Ex. 39 at F3).  The page scrolled to the top, and a yellow dialogue box and a pop-up box appeared.  (Tr. Day 1 at 137; Pl.'s Ex. 39 at F4).  The pop-up box had "OK" and "Cancel" buttons and began, "ATTENTION:  Read below before pressing OK" like the other pop-up boxes.  (Tr. Day 1 at 138; Pl.'s Ex. 39 at F4).  In this pop-up box, however, the rest of the text was behind a scroll bar; it contained the same text as the pop-up box of the second buy, but Tyndall scrolled down using the scroll bar to read all of the text.  (Tr. Day 1 at 138; Pl.'s Ex. 39 at F4-F7).  The initial pop-up box that appeared–without scrolling—said only "ATTENTION:  Read below before pressing OK" and then had the "OK" and "Cancel" buttons.  (Tr. Day 1 at 139; Pl.'s Ex. 39 at F4).  No other language would be seen absent scrolling.  (Tr. Day 1 at 139).

Tyndall clicked "OK" and the pop-up box disappeared.  (Id.).  Tyndall was then at the top of the application page, and as he scrolled down the page he noticed that the "check box" in the Unified Savings ad was then checked.  (Id. at 140; Pl.'s Ex. 39 at F9).  It appeared to Tyndall that when he hit the OK button, the effect was to check the Unified Savings box that was previously unchecked.  (Id. at 142).  Tyndall wanted to see what would happen if he then "unchecked" that box, so he unchecked it and then hit the green "Confirm" button.  (Id.; Pl.'s Ex. 39 at F10).  When he did so, he was taken to a different URL page—no longer citywestfinancial.com—and to an offer for a different financial product that

appeared to be from a non-Defendant.  (Tr. Day 1 at 143-44; Pl.'s Ex. 39 at F12).  Tyndall

ceased the third undercover buy at that point.  (Tr. Day 1 at 144).

On cross-examination, Tyndall acknowledged that the pop-up box with the OK and

Cancel buttons took up approximately the middle third of the computer screen and was in

English, in a font that was large enough to read. (Id. at 180).  Tyndall stated that he

"eventually" came to the conclusion—after reading the box several times—that by clicking

OK he would be signing up for a year of services and that by clicking Cancel he would be

rejecting it.  (Id. at 181-82).  After doing that, he anticipated that his undercover bank

account would indeed be debited, and three weeks after the first buy, it was.  (Id. at 182-83).

Tyndall also explained that when he conducted the third buy, he used a different

workstation, which had a different version of the Firefox web browser on it than had the

workstations he had used previously.  (Id. at 187-88).  Using that version, he had to scroll

down to read the full contents of the pop-up box.  (Id. at 189).

Defendants Wood and Berry testified regarding their decision to use the "OK" or

"Cancel" pop-up box on the websites, which they clarified is not a "pop-up window" that

would be blocked by a pop-up blocker and which they referred to as a "confirm box."  Berry

explained that this "confirm box" is a standard Javascript call that is available on all common

browsers. (Tr. Day 3 at 166).  As stated by Berry, in light of the variety of available browsers

and the advent of mobile devices, it is challenging to build a website that will work on all

different browsers, and they employed this confirm box because it would work across

various devices, including mobile devices, iPads, tablets, and older browsers.  (Id. at 166-

169, 221-22).  This confirm box forces an interaction because the user cannot close the box

without closing the entire screen—unless the browser or entire screen is closed, either OK or Cancel must be chosen for the confirm box to go away.  (Id. at 38-40 (Wood Test.); id. at 168 (Berry Test.)).

Berry further explained that he could not change the labeling of the buttons when using this confirm box; he could not, for example, change "OK" to "Yes."  (Id. at 168). However, he and Wood did have control over the text that appeared in the box.  (Id.).  Wood wrote the text that appeared in the box and elsewhere on the webpages, and it was Wood's ultimate decision as to what was put on the webpages and how the content was positioned on the pages.  (Id. at 141-42).  Wood gave Berry the text to put into the pop-up box, and Berry defined, technologically speaking, what would happen after a customer hit "OK" or "Cancel."  (Id. at 218-19).

Berry also testified regarding Tyndall's account of the third buy, in which Tyndall encountered a pop-up box that required scrolling to reveal all of the box's contents.  Berry had not previously seen that occur, and Berry explained that Tyndall was using a beta version of Firefox during that buy; according to Berry's user records—which indicate operating systems and browsers of users—Tyndall was the only customer who used that version.  (Id. at 177, 178, 180).

III.  Consumer Testimony

Eight consumers testified at trial regarding their experiences with Defendants' websites and enrollment in the discount clubs.  All of these consumers filled out payday loan applications on one of WKMS's websites and later discovered debits from their bank accounts that they did not recognize.  Three of the eight recalled seeing a pop-up box but

did not read the contents of the pop-up box.  (Tr. Day 1 at 27-28, 33 (Nokes Test.); id. at 54 (Hill Test.); id. at 77, 79 (Love Test.)).  One explained that the box "look[ed] like a normal 'I accept these terms and conditions'" type of box, and she assumed it was part of the terms and conditions of the payday loan, so she pressed OK as the box directed.  (Id. at 27-28, 33 (Nokes Test.)).  Another did not recognize the pop-up box that she was shown in court as the one she recalled.  (Id. at 57-58 (Hill Test.)).  The third thought the box had to do with the loan itself, and when she was unable to "x out" of the box, she eventually clicked "OK." (Id. at 63, 77-79 (Love Test.)).  The other five consumers did not recall seeing a pop-up box during the loan application process.

Six of the eight testifying consumers received refunds of the debits after they complained to Defendants, BBBs, their banks, or a local law enforcement agency.  But, several of those six did not receive refunds of the bank overdraft charges they incurred after their accounts were debited.  The other two did not attest to receiving refunds of any charge. Additionally, several of the consumers testified that they ultimately closed their bank accounts and opened new ones, citing concerns about compromised security of their accounts.  (See, e.g., id. at 32 (Nokes Test.); id. at 68 (Love Test.); Tr. Day 2 at 8 (Calvo Test.); id. at 27-28 (Madisen Test.)).

In addition to the consumers who testified at trial, the FTC presented declarations of nineteen other consumers.  (Pl.'s Exs. 55-61, 63-68, 70-74, & 76).  These consumers gave similar accounts of their experiences regarding unknowing enrollment in the discount programs.  (See, e.g., Battaglia Decl., Pl.'s Ex. 56, at 2-3 ("I am pretty careful about reading fine print and signing up for things, but I did not notice anything on the site mentioning or

advertising any kind of club, or indicating that by applying for a loan I was authorizing a membership club to withdraw money from my bank account. . . . I eventually got back the money that Direct Benefits took, but I did not get a refund of the overdraft charges from the bank.")).

### IV.  Email Confirmations and Bank Account Debits

Wood and Berry testified that immediately after a consumer enrolled in one of the discount clubs, an automatically generated confirmation or "welcome" email was immediately sent to the email address that the consumer had included on the payday loan application.  (Tr. Day 3 at 66, 69 (Wood Test.); Defs.' Ex. 3; Tr. Day 3 at 174 (Berry Test.)).  But, Wood acknowledged that nothing in the emails that were sent—which had the subject line, for example, "Welcome to Unified Savings"—referred to a payday loan or a payday loan application; that he did not know how many of the emails ended up in a spam or junk mail folder; that "there's no process [by] which [they] can know how many consumers actually saw the email"; and that the amount that would be charged was not mentioned until the fourth page of the printed version of the email that was admitted into evidence.  (Tr. Day 3 at 131-33; Defs.' Ex. 3).  Berry testified that they "did what [they] could" to prevent the emails from ending up in a spam filter.  (Tr. Day 3 at 175).

Tyndall, the FTC investigator who testified as to his "controlled buys" and was seeking to purchase the product, did receive a confirmation email on the day of the first buy confirming his purchase of Thrifty Dial in the amount of $98.40.  (Tr. Day 1 at 183 (Tyndall Test.)).  However, none of the testifying consumers—who, unlike Tyndall, were not seeking to enroll in one of the discount clubs and did not knowingly attempt to enroll—recalled ever

receiving such an email.

Wood and Berry testified, and the exhibits of both sides supported, that consumers' bank accounts were not debited until at least ten days after online enrollment in the discount clubs.  (Tr. Day 3 at 105 (Wood Test.); id. at 174 (Berry Test.)).  As explained by Wood, charges to consumers' bank accounts were done through demand draft debits, also called "remotely created payment orders."  (Id. at 158).  When the payment orders were created—after the "OK" button in the pop-up box was clicked—Defendants' payment processing company inserted the consumer's name, address, and bank account information on the order, and in the space for a signature, the payment order indicated "authorization on file."  (Id. at 158-59).

### V.  Complaints

Many consumers complained about the debits to their bank accounts—to their banks; to Defendants directly; to Defendants' payment processors; to BBBs; to local law enforcement agencies; to state attorneys general; and to the FTC.  The FTC introduced into evidence composite exhibits of complaints that consumers made to BBBs in Florida, Wyoming, Colorado, Delaware, and Utah, (Pl.'s Exs. 43-46), and Wood acknowledged being aware of 272 complaints being made to either the BBB or the FTC, (Tr. Day 3 at 79).

All of the testifying consumers complained either directly to Defendants or to a BBB or governmental entity.  Some of them were given refunds upon request to Defendants, but others recounted a lack of cooperation from Defendants.  For example, Victoria Nokes testified that she argued on the phone with Direct Benefits Group for thirty minutes, repeatedly asking for a refund, but was told there was no recourse; after complaining to the

BBB, she did receive a refund.  (Tr. Day 1 at 30-31).  Others reported difficulty reaching a live person, rudeness, and that customer service representatives hung up on them.  (Tr. Day 2 at 6, 7, & 22 (Calvo and Madisen Test.)).

Gabrielle Lynn, the office manager at Defendants' Bluffdale, Utah office, testified in her deposition that ninety percent of the phone calls received in the office were from complaining or confused customers, fifty percent of whom were "irate." (Lynn Dep., Pl.'s Ex. 49, at 39).  Lynn estimated that by July 2011—when calls had dwindled—they were receiving 50 or 60 calls per day. (Id. at 15-16).  Complaints also were received via email and regular mail.  (Id. at 14-16).  Every few weeks, Lynn gave Wood a list regarding how complaints were handled.  (Id. at 14).  Defendants Berry and Wood acknowledged an awareness that the complaints were being made, but, despite their acknowledged supervisory roles over Lynn, who oversaw customer service, they were unable to estimate the number of complaints received.  (See, e.g., Tr. Day 3 at 185 (Berry Test.)).

Additionally, consumers complained to a Minnesota business named Direct Benefits, Inc. ("DBI"), which is not affiliated with Defendant Direct Benefits Group.  The owner of DBI, Thomas Mayer, explained during his trial testimony that DBI is a managing general insurance agency that markets insurance products and has nothing to with payday loans, buying clubs, or long-distance telephone service.  (Tr. Day 1 at 95-96).  In January 2010, DBI began fielding calls, emails, and online chats from consumers asking to have their money returned.  (Id. at 96).  Initially, DBI told the consumers that DBI had not sold them anything and did not know what they were talking about.  (Id.).  DBI then did some research and found out about Direct Benefits Online, which was selling "these memberships." (Id.).

Mayer described the complaints that DBI received as "intense" and the callers as "irate." (Id. at 97).  Mayer conservatively estimated that DBI received 2,000 complaints about Direct Benefits Group from January 2010 to July 2011.  (Id.).  During some weeks DBI received as many as fifty calls complaining about Direct Benefits Online.  (Id.).  There were ten people at Mayer's company, and each one of them might deal with one or two of these calls per day.  (Id. at 102-03).  The callers began the calls by yelling and screaming at Mayer's staff.  (Id. at 97).  Some of the callers were distraught and in tears.  (Id.).  For example, some callers told Mayer that he had stolen $49 out of their checking account without authorization and asked how he had obtained their checking account information.  (Id. at 98).  DBI employees who took such calls first had to calm down the callers and explain that they had the wrong company; then they gave the callers the phone number and email address of Direct Benefits Online.  (Id.).

After the calls started coming in, Mayer contacted Direct Benefits Online and talked to a "woman named Gabrielle"—now known to be Gabrielle Lynn, though she would not tell Mayer her last name when he asked for it.  (Id. at 99-100).  Mayer suggested that Direct Benefits Online put its 800 number on the checking statements so that the customers would know whom to call.  (Id. at 100).  He also suggested that Direct Benefits Online update its phone system to state that it was not affiliated with DBI.  (Id.).  Gabrielle told Mayer that she would talk to the manager and see if there was anything that she could do, but she would not tell Mayer the name of her manager or the owner of the company.  (Id.).

Mayer estimated that he spoke to Gabrielle about four times; his office manager also spoke to Gabrielle numerous times.  (Id. at 101).  At one point Mayer told Gabrielle that

Direct Benefits Online was "killing [his] business" because it was having to field hundreds of calls from Direct Benefits Online's customers.  (Id. at 102).  Gabrielle told Mayer there was nothing more that Direct Benefits Online could do and that Mayer would "just have to live with this."  (Id.).

By June 2010, Mayer was so frustrated that he filed a complaint with the BBB in Wyoming.  (Id. at 103).  After that, the complaints continued to come in.  (Id. at 104).  Mayer encouraged the callers to call BBBs and attorneys general.  (Id. at 105).  A sampling of the online chat complaints that DBI received was admitted into evidence.  (Pl.'s Ex. 88).  Mayer explained, however, that most of the complaints were received on the phone.  (Id. at 106).  No one other than Gabrielle ever responded to Mayer's phone calls to Direct Benefits Online.  (Id. at 107).  Mayer sent emails to Gabrielle also, but she never acknowledged receiving them.  (Id. at 112).  Wood's records reflected that Mayer sent forty-seven emails over an eighteen-month period.  (Tr. Day 3 at 107 (Wood Test.); Defs.' Ex. 19).

## VI.  Revenue and Returns

From 2009 to 2011, 628,546 consumers were enrolled in, and charged for, the discount club programs through WKMS's payday loan websites, (Tr. Day 3 at 78, 160 (Wood Test.); Defs.' Ex. 1), each incurring a charge ranging from $39.95 to $99.90.  The total amount processed by Defendants' payment processors for all of the discount club products was $35,628,176.  (Tr. Day 3 at 125-26 (Wood Test.); Pl.'s Ex. 33).  Returns, however, totaled over $22 million, and after chargebacks, returns, and refunds, the net revenue to Defendants for all of the products was $9,512,172.  (Tr. Day 3 at 126-29 (Wood Test.); Pl.'s Ex. 33).

Defendants used several different payment processors, including Landmark Clearing and Public Savings Bank, to process the consumer payments for the discount club memberships.   (Tr. Day 3 at 124-25 (Wood Test.); Tr. Day 2 at 80 (Barton Test.)). Landmark Clearing terminated its payment processing relationship with Direct Benefits Group in February 2011 based on complaints, overall return percentages, and unauthorized return percentages. (Pl.'s Ex. 42; Tr. Day 1 at 161 (Tyndall Test.)).  Similarly, Public Savings Bank, which handled payment processing for Direct Benefits group beginning in the fall of 2010 and for Unified Savings and Thrifty Dial beginning in early 2011, ceased its payment processing relationship with these entities in late June 2011 due to high return rates.[6]  (Tr. Day 2 at 80, 94, 98 (Barton Test.)).

Returned transactions represented a variety of situations, as explained at trial largely through the testimony of Jeffrey Barton, who worked for Public Savings Bank from January 2010 to August 2011.  (Id. at 74).  Barton explained that when a bank processes a check payment for a customer and the check cannot be processed for some reason, the bank has to return that check to the bank of first deposit.  (Id. at 81).  When returning a check, the bank must select a reason for the return, and Barton reviewed return descriptions on a document called a "returns report detail" reflecting returned check activity of Direct Benefits

---

[6]In addition to these four clients, Public Savings Bank had other customers with similar high return rates, and the bank also terminated several other such customers at the same time for the same reason. (Tr. Day 2 at 99, 117-18).  The bank decided in July 2011 to terminate business with all customers who had return rates of 50 percent or higher.  (Id. at 117).  Later in July, about fifteen more customers were terminated for that reason, and a few weeks later Public Savings Bank decided to discontinue all of its payment processing business.  (Id. at 100).

Group, Voice Net Global, Unified Savings, and Thrifty Dial during the time that they did business at Public Savings Bank.  (Id. at 79-80, 82; Attachs. to Pl.'s Ex. 102).

The total return rate by check volume for Direct Benefits Group was 54.96%; for Voice Net Global, 58.03%; for Unified Savings, 78.27%, and for Thrifty Dial, 79.86%.  (Tr. Day 2 at 81; Attachs. to Pl.'s Ex. 102).  The overall rates of return for "account closed"—meaning that the account against which the check was to be posted was closed—for Direct Benefits Group, Voice Net Global, Unified Savings, and Thrifty Dial, respectively, were 7.76%, 9.71%; 10.31%, and 10.90%.  (Tr. Day 2 at 82-83; Attachs. to Pl.'s Ex. 102).  The respective rates of return for "nonsufficient funds" were 29.51%, 29.75%, 39.89%, and 40.12%.  (Tr. Day 2 at 82; Attachs. to Pl.'s Ex. 102).  In the category of "not authorized," which Barton explained means that the customer claimed to his or her bank that he or she did not initiate or authorize the transaction, the return rates for Direct Benefits Group, Voice Net Global, Unified Savings, and Thrifty Dial were 2.14%, 1.82%, 3.45%, and 3.46%, respectively.  (Tr. Day 2 at 84; Attachs. to Pl.'s Ex. 102).  In his trial testimony, Wood acknowledged that these return rates were accurate and that throughout the two years of their operations, the businesses had return rates of approximately 70%.  (Tr. Day 3 at 134-37).

In response to the high return rates, Public Savings Bank increased the fees for unauthorized charges, but that did not result in any noticeable change in the amount of returns.  (Tr. Day 2 at 91 (Barton Test.)).  Additionally, Public Savings Bank received hundreds of complaints from consumers regarding Direct Benefits Group and the other companies.  (Id. at 91-92).  The nature of most of the complaints was that the consumer did

not know about the charge or did not authorize it.  (Id. at 92).  And, in the spring of 2011, the bank received two formal letters—one from Wachovia Bank and one from Bank of America—expressing concern about the number of returns and asking Public Savings Bank to look into it.  (Id. at 92-93).

The applications that Defendants filled out with their payment processors reflected that Defendants were anticipating a large percentage of returns.  For example, on a Landmark Clearing "Required Survey for High Risk Clients" completed by Wood on behalf of Direct Benefits Group in April 2010, Wood indicated that Direct Benefits Group expected 12,000 check transactions per month and 8000 returns per month, with 50% of those expected to be returned for insufficient funds.  (Pl.'s Ex. 30; Tr. Day 1 at 174 (Tyndall Test.)).  A survey reflecting the same expected levels of transactions and returns was completed by Berry or Lynn on behalf of Voice Net Global in May 2010.  (Pl.'s Ex. 31; Lynn Dep. at 33-34).  Another Direct Benefits Group payment processing application in April 2010 reflected that a return rate of 70% was anticipated.  (Pl.'s Ex. 79; Tr. Day 1 at 162-63 (Tyndall Test.)).

VII.  The Bluffdale Office and Defendants' Business Operations

As earlier noted, Wood and Berry operated their companies out of shared office space in Bluffdale, Utah.  Lynn also worked there beginning in September 2009; she started as an administrative assistant and her title was later changed to office manager.  (Lynn Dep. at 6-8).  Over time, personnel were added to handle customer service calls, and ultimately there were eight to ten employees at the Bluffdale office.

Shortly after the FTC filed this case, and in conjunction with the entry of a Temporary Restraining Order ("TRO") (Doc. 15), a receiver, Brian McDowell, was appointed as to the

business entity Defendants.  McDowell testified at trial regarding his receivership activities, which included taking custody and control of the Bluffdale premises.  (Tr. Day 2 at 134). When McDowell arrived at the Bluffdale office, he or someone on his behalf interviewed all of the employees on-site—eight in all—including Wood.  (Id. at 157-58).

McDowell described Wood as cooperative, and McDowell was given a demonstration of the functioning of the payday loan application websites and the Direct Benefits Online, Unified Savings, and Thrifty Dial offers.  (Id. at 158).  The activity that had been proscribed by the TRO had ceased about three weeks prior to McDowell's arrival in Bluffdale, but, as Defendants demonstrated to McDowell, it could have been reinstated at any time.  (Id. at 146).  The only business that was happening at Direct Benefits Group was the receipt of customer service calls, and McDowell was not able to identify that Voice Net Global was operating when he arrived.  (Id. at 146-47).

McDowell explained that the businesses at the Bluffdale office were indistinct because of commonality of employees, independent contractors, physical location, and computer hardware.  (Id. at 149, 163).  According to the accounting records and employee interviews, Solid Core provided employees to Direct Benefits Group and Voice Net Global and was compensated for providing those employees.  (Id. at 169).  Additionally, Solid Core personnel were involved in the work of Direct Benefits and were doing the work of Direct Benefits Group, which had no employees, as well as of the other entities.  (Id. at 170-71). McDowell determined that all of the payroll charges for the businesses were being borne by Solid Core; all of the employees were either employees or independent contractors of Solid Core.  (Id. at 148-49).  There were financial transfers between and among the corporate

entities, with a general flow of funds out of WKMS, Direct Benefits Group, and Voice Net Global to Solid Core and to non-Defendant World Wide Marketing Group, which was also owned by Wood.  (Id. at 150).  There were transactions back and forth on a regular basis. (Id.).

McDowell was not able to determine that WKMS's business—related to buying and selling payday loan leads—was prohibited by the TRO or was unlawful.  (Id. at 168). McDowell accordingly informed Defendants that WKMS could continue to operate so long as Defendants funded it and did not put at risk funds that were seized pursuant to the TRO. (Id. at 165-66).  Ultimately, however, Defendants' then-attorney informed McDowell that Defendants were not interested in continuing the business of WKMS.  (Id. at 167).

Lynn explained in her deposition that she was hired and paid by Solid Core but that she performed work for Solid Core, Voice Net Global, WKMS, and Direct Benefits Group. (Lynn Dep. at 7, 10).  Lynn was supervised by both Wood and Berry, and everyone at the Bluffdale location was paid through Solid Core.  (Id. at 11-12).

In their trial testimony and in declarations filed earlier in the case, Wood and Berry acknowledged their ownership and management of the four corporate entities—WKMS and Direct Benefits Group by Wood, and Solid Core and Voice Net Global by Berry.  (Tr. Day 3 at 109 (Wood Test.); id. at 184 (Berry Test.); Pl.'s Exs. 52 & 104).  They also acknowledged being close working partners with one another's businesses and to each being personally familiar with the operations of all four businesses.  (Tr. Day 3 at 110 (Wood Test.); id. at 184-85 (Berry Test.); Pl.'s Exs. 52 & 104).  Berry helped WKMS with its equipment, including buying CPUs and other equipment, and Berry acknowledged signing documents on behalf

-24-

of Voice Net Global, including payment processing applications.  (Tr. Day 3 at 197).

The FTC also presented evidence through another investigator, Michael Liggins, regarding Wood and Berry's affiliations with the four businesses, including records from the secretaries of state of Utah and Wyoming.  (Tr. Day 2 at 184-91; Pl.'s Exs. 4, 7, 8, 10, 11, & 12).  Additionally, Liggins testified regarding records he obtained from private companies reflecting that Berry was the registrant for many domain names, including directbenefitsonline.com, citywestfinancial.com, and wkmsinc.com.  (Id. at 193-94; Pl.'s Exs. 14 & 15).

## VIII.  The Merits of the FTC's Claims

Section 5(a) of the FTCA, 15 U.S.C. § 45(a), provides in part that "unfair or deceptive acts or practices in or affecting commerce[] are . . . unlawful."  In Count I, the FTC alleges that the Defendants engaged in unfair billing practices in violation of this section by obtaining consumers' bank account information and debiting those accounts without the consumers' consent.  The FTC alleges in Count II that the Defendants engaged in deceptive acts in violation of this section by failing to adequately disclose material information.  As set forth below, at trial the FTC established both of these violations.

### A.  "In or Affecting Commerce"

As an initial matter, Defendants' acts and practices clearly were "in or affecting commerce" under § 5(a) the FTCA.  See 15 U.S.C. § 44 (defining "commerce" as including "commerce among the several States").  From their Utah office and also using addresses in other states, Defendants engaged in transactions with customers throughout the United States.

### B.  Unfair Billing Practices (Count I)

An "unfair practice" under § 5(a) is "one that '[1] causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition.'" FTC v. Accusearch Inc., 570 F.3d 1187, 1193 (10th Cir. 2009) (alterations in original) (quoting 15 U.S.C. § 45(n)).  An unfair practice does not require knowledge of consumer harm.  FTC v. Neovi, Inc., 604 F.3d 1150, 1156 (9th Cir. 2010).

At trial, the FTC established each of the three unfair practice elements.  First, the FTC showed that the billing practices at issue caused substantial injury to consumers.  "An act or practice can cause 'substantial injury' by doing a 'small harm to a large number of people . . . .'" Neovi, 604 F.3d at 1158 (9th Cir. 2010) (quoting Am. Fin. Servs. Ass'n v. FTC, 767 F.2d 957, 972 (D.C. Cir. 1985)); see also Orkin Exterminating Co. v. FTC, 849 F.2d 1354, 1365 (11th Cir. 1988).  Such was the situation here.  Each consumer who was enrolled in the discount programs incurred a bank account debit of between $39.95 and $99.90.  More than 628,000 consumers were enrolled in the discount programs, resulting in payments to Defendants of more than $9.5 million after accounting for returns, refunds, and chargebacks.  (Wood Test. Day 3 at 78, 129).

Second, the FTC established that the injury was not reasonably avoidable by consumers because of the confusing and misleading way the payday loan application process operated.  After entering bank account information for the purpose of receiving a payday loan, and after ignoring or not noticing an ad for an unrelated discount club product, thousands of consumers were enrolled in discount programs by clicking "OK" or hitting

"enter" after a pop-up box appeared.  As aptly explained by FTC Investigator Tyndall during his testimony, the application process and the pop-up box conveyed the impression that selecting "OK" would continue the applicant on the path that the applicant was already on—submitting a loan application without enrolling in a discount program or agreeing to a debit from a bank account that was supposed to used for direct deposit of a payday loan. Moreover, the pop-up box Tyndall encountered during his first undercover buy did not disclose that the consumer's bank account would be charged for the membership fee.  (Pl.'s Ex. 35 at B5).

I agree with the FTC's characterization that the Defendants took advantage of financially distressed consumers who went to websites seeking payday loans to cover immediate expenses, only to end up having debits to their bank accounts that sometimes resulted in overdraft charges in addition to the initial charges themselves.  Consumers incurred charges for products and services they were not seeking, did not want or need, could not afford, and did not intend to purchase.  And, the fact that many customers were able to—eventually—obtain refunds from Defendants does not render the injury avoidable. Cf. Neovi, 604 F.3d at 1158 ("'It is likely that some consumers never noticed the unauthorized withdrawals.  Even if the consumer did notice, obtaining reimbursement required a substantial investment of time, trouble, aggravation, and money. . . . Regardless of whether a bank eventually restored consumers' money, the consumer suffered unavoidable injuries that could not be fully mitigated.'" (quoting district court decision)).

Third, the substantial injury to consumers was not outweighed by countervailing benefits.  Defendants' own evidence suggests that the vast majority of the more than

628,000 consumers who were enrolled in the discount programs never used any of the discount offerings.  Wood testified that there were 26,616 unique visitors to the Direct Benefits Online website over an eleven-month period, and only a fraction of those logged in—with a membership name and password they received at enrollment—on sections of the site such as "staff picks," "coupons," and "vouchers" to view or possibly use the discounts available to them.[7]  (Tr. Day 3 at 23-25; Defs.' Ex. 9).  Even assuming that some consumers who were enrolled did use some of the discount products, such use would not outweigh the substantial injury to duped consumers.

In sum, all three elements of an "unfair practice" are satisfied here, and thus the FTC prevails on Count I of the Complaint.

C.  Deceptive Acts (Count II)

"A practice is deceptive under the Federal Trade Commission Act 'if it is likely to mislead consumers acting reasonably under the circumstances . . . in a way that is material.'"  FTC v. Grant Connect, LLC, 827 F. Supp. 2d 1199, 1214 (D. Nev. 2011) (alteration in original) (quoting FTC v. Cyberspace.com LLC, 453 F.3d 1196, 1199 (9th Cir. 2006)).  A § 5 violation "only requires a showing that misrepresentations 'possess a tendency to deceive.'"  FTC v. Commerce Planet, Inc., 878 F. Supp. 2d 1048, 1073 (C.D. Cal. 2012) (quoting Trans World Accounts, Inc. v. FTC, 594 F.2d 212, 214 (9th Cir. 1979)).

---

[7]A Google analytics document submitted by Defendants reflects that the largest number of logins on the Direct Benefits Online website—8,486—occurred on the "staff picks" section, followed by 3,819 on "vouchers" and other lower numbers of logins on other sections. (Defs.' Ex. 9).  The "rebates" section, which pertained to the only product that would ultimately cost Defendants money in order to produce it to the customer to fulfill—was visited by only 649 customers.  (Id.; Tr. Day 3 at 25 (Wood Test.)).

"While proof that consumers actually were deceived is not required, such evidence is 'highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances.'" Grant Connect, 827 F. Supp. 2d at 1215 (quoting Cyberspace.com, 453 F.3d at 1201).

"District courts consider the overall, common sense 'net impression' of the representation or act as a whole to determine whether it is misleading." Commerce Planet, 878 F. Supp. 2d at 1063 (citing FTC v. Gill, 265 F.3d 944, 956 (9th Cir. 2001)). "'A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures.'" Grant Connect, 827 F. Supp. 2d at 1214 (quoting Cyberspace.com, 453 F.3d at 1200).

The FTC has established that Defendants engaged in deceptive practices in violation of § 5(a) by failing to adequately disclose material information on the websites.  The operation of the pop-up box and manner in which consumers were enrolled in the discount programs was likely to mislead reasonably-acting consumers—and did mislead such consumers—in a material way.  As demonstrated by the consumer testimony and the thousands of complaints made to Defendants and others, many consumers clearly were deceived and inadvertently became enrolled in Defendants' discount programs.  This evidence is highly probative of the websites' tendency to mislead. See Grant Connect, 827 F. Supp. 2d at 1215; Commerce Planet, 878 F. Supp. 2d at 1075 (finding "the evidence of consumer complaints credible and highly probative evidence that the website marketing . . . was misleading and deceptive").  Additionally, although intent to deceive is not required for a § 5(a) violation to occur, the fact that Defendants anticipated—and later actually

experienced—a large percentage of returns, with half of those returns being for insufficient funds, is also indicative of the nature of this venture, as is the low usage of the discount memberships.  See Grant Connect, 827 F. Supp. 2d at 1221-22 ("The conclusion that Defendants' . . . offers were deceptive as a matter of law is further bolstered by the high cancellation, refund, and chargeback rates, as well as the exceptionally low orders from the store in comparison to the number of people signed up for the offer."); Commerce Planet, 878 F. Supp. 2d at 1076 ("The Court finds [the] history of excessive chargeback rates to be consistent with deceptive website marketing.").

The overall "net impression" created by the landing page and the payday loan application form on the payday loan websites is that they were intended for applying for payday loans and that the bank account information that applicants were asked to enter would be used for deposit of the payday loan—not so that the account could or would be debited for the purchase of an unrelated product or service.  Additionally, the common sense "net impression" of a pop-up box that appears after hitting a "Submit" button on a loan application would not be that clicking "OK" would result in the purchase of an unrelated product or that clicking "Cancel" would continue the application process without changes or additions.  Indeed, quite the opposite is true; a reasonable user would think that hitting "OK" would continue the application process as it had progressed to that point and that "Cancel" would result in a change of course.

Defendants assert that their websites were compliant with the FTC's guidance for

online advertising published in a document called "Dot Com Disclosures."[8]   However, I cannot agree.

The "Dot Com Disclosures" guidance explains that "[m]any of the general principles of advertising law apply to Internet ads, but new issues arise almost as fast as technology develops."  Dot Com Disclosures at 1.  Additionally, "[d]isclosures that are required to prevent an ad from being misleading, to ensure that consumers receive material information about the terms of a transaction or to further public policy goals, must be clear and conspicuous."  Id.  Factors considered in determining whether disclosures are likely to be clear and conspicuous include:  "the *placement* of the disclosure in an ad"; "its *proximity* to the relevant claim"; "the *prominence* of the disclosure"; "whether items in other parts of the ad *distract attention* from the disclosure"; and "whether the language of the disclosure is *understandable* to the intended audience."  Id. (emphasis in original).  Suggestions for making disclosures clear and conspicuous include:  "[r]ecognize and respond to any technological limitations or unique characteristics of high tech methods of making disclosures, such as frames or pop-ups" and "[u]se clear language and syntax so that consumers understand the disclosures."  Id. at 2.

The Dot Com Disclosures further explain the importance of the "overall net

<hr/>

[8]In their filings, Defendants cite the FTC's 2000 guidance document, FTC, Dot Com Disclosures: Information About Online Advertising (May 2000), available at http://www.ftc.gov/os/2000/05/0005dotcomstaffreport.pdf.  (See Doc. 219 at 7).  The FTC issued updated guidance after the trial in this case.  See FTC, .com Disclosures: How to Make Effective Disclosures in Digital Advertising (March 2013), available at http://www.ftc.gov/os/2013/03/130312dotcomdisclosures.pdf. Citations in the text are to the 2000 guidance.

impression" of the ad and advise advertisers that they "should assume that consumers don't read an entire Web site, just as they don't read every word on a printed page." Id. at 5. Further, the guidance notes that consumers "may not be looking for—or expecting to find—disclosures" and thus "disclosures must be communicated effectively so that consumers are likely to notice and understand them." Id. Additionally, the Dot Com Disclosures note that "Web sites . . . are interactive and have a certain depth—with multiple pages linked together and pop-up screens, for example—that may affect how proximity is evaluated." Id. at 6.

The FTC's Dot Com Disclosures guidance also advises advertisers to conduct research regarding whether a particular technique will effectively communicate information to consumers. Id. at 10. "For example, research may show that consumers don't actually read information in pop-up windows because they immediately close the pop-up on the page they want to view. It also may indicate whether consumers relate information in a pop-up window or on an interstitial page to a claim or product they haven't encountered yet." Id. Additionally, the guidance emphasizes that "[d]isclosures must be effectively communicated to consumers before they make a purchase or incur a financial obligation." Id. at 11.

Applying these principles, the disclosures on the payday loan websites were not clear and conspicuous. As is apparent from the testimony of the consumer witnesses, consumers often did not notice the banner advertisements describing the discount club memberships. Then, when consumers clicked the "Submit" button to submit their loan applications without checking the box for the discount club membership enrollment, a gray-backgrounded pop-up box would unexpectedly appear. The text of the pop-up box began "ATTENTION:  Read

below before pressing OK," suggesting that the next step in the loan application process was to press "OK," which in at least some instances was preselected and highlighted.[9]   Some consumers testified that they pressed the OK button believing that by doing so, all they were doing was continuing the submission process for their payday loan application.  Whether by hitting the enter button or "OK," many consumers unknowingly and unwittingly enrolled in the discount clubs.

The gray pop-up box appeared after consumers had already either not noticed or chosen to decline the offers for the discount clubs—products or services that were unrelated to the payday loans.  The FTC investigator who went to the payday loan websites with the intention of enrolling in the discount programs as part of his investigation testified that he had to read the pop-up box several times before he could understand what the "OK" and "Cancel" buttons meant.  At first, he thought that selecting "OK" would continue him down the path he had already taken—the payday loan application process—and that selecting "cancel" would stop the application process.  This was a reasonable expectation and one that many, if not most, consumers would have—especially those who, unlike the FTC investigator, were not on notice of the discount programs or on the lookout for how enrollment in the discount programs occurred on the payday loan websites.

_____

[9]I credit Tyndall's testimony—supported by the videos of the controlled buys, (Pl.'s Exs. 89-91)—that the "OK" button was preselected and highlighted, with the result that pushing the Enter key would choose the "OK" option.  Even if this were not the case, however, my conclusions would be the same.

Additionally, I accept Berry's testimony that Tyndall was the only enrollee who used the beta version of Firefox that required scrolling in the pop-up box. While the scrolling issue would make the pop-up box even more troubling, the conclusions in this Order apply even where browsers did not require scrolling to view the contents of the pop-up box.

Although Defendants assert that the text of the pop-up box was in plain English, in a legible font, and not difficult to read, the pop-up box was confusing, distracting, and counterintuitive in its operation.  The pop-up box obscured the banner ad by being on top of it, and the directions in the box to "read before pressing OK" suggested that ultimately users should press OK.  Moreover, the Thrifty Dial pop-up box that Tyndall encountered during his first controlled buy did not even disclose in any terms that the consumer's bank account would be debited for the membership charge.  (See Pl.'s Ex. 35 at B5).  And, while Defendants claimed that their "hands were tied" by the "OK" and "Cancel" buttons in the confirm box, Defendants chose to use this type of box on the websites, and they admittedly retained control over the content of the text in the confirm box.  Defendants may not properly blame the standard confirm box button labels for the shortcomings of their disclosures.

In sum, the evidence presented at trial establishes that Defendants did not adequately disclose to consumers that in addition to using consumers' financial information in connection with their payday loan applications, Defendants would also use that financial information to charge the consumers for unrelated products and services.  This information was clearly material to the consumers.  Defendants violated § 5(a) of the FTC Act by failing to adequately disclose that the bank account information would be used to charge consumers for unrelated products.  The FTC prevails on Count II.

IX.  Common Enterprise

The FTC asserts that the Defendants acted as a "common enterprise" such that they are liable for the acts of one another.  Based on the evidence presented at trial, I agree.

"If the structure, organization, and pattern of a business venture reveal a 'common

enterprise' or a 'maze' of integrated business entities, the FTC Act disregards corporateness." FTC v. Wash. Data Res., 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012), aff'd, 704 F.3d 1323 (11th Cir. 2013).   Thus, "'[w]hen corporations act as a common enterprise, each may be held liable for the deceptive acts and practices of the other.'" Grant Connect, 827 F. Supp. 2d at 1216 (quoting FTC v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008)).

"When determining whether a common enterprise exists, 'the pattern and frame-work of the whole enterprise must be taken into consideration.'" Nat'l Urological Grp., 645 F. Supp. 2d at 1182 (quoting Del. Watch Co. v. FTC, 332 F.2d 745, 746 (2d Cir. 1964)). "[C]ourts consider 'a variety of factors, including:  common control, the sharing of office space and officers, whether business is transacted through a maze of interrelated companies, unified advertising, and evidence which reveals that no real distinction existed between the Corporate Defendants.'" FTC v. NHS Sys., Inc., Civ. Action No. 08-2215, 2013 WL 1285424, at *7 (E.D. Pa. Mar. 28, 2013) (quoting FTC v. Millennium Telecard, Inc., No. 11-2479, 2011 WL 2745963, at *8 (D.N.J. July 12, 2011); accord Wash. Data Res., 856 F. Supp. 2d at 1271 ("A 'common enterprise' operates if, for example, businesses (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing."); see also FTC v. Network Servs. Depot, Inc., 617 F.3d 1127, 1142-43 (9th Cir. 2010) ("[E]ntities constitute a common enterprise when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues."). "Moreover, the common enterprise [inquiry] is not an alter ego

analysis.  The entities formally may be separate corporations[] but operate as a common enterprise."  Grant Connect, 827 F. Supp. 2d at 1218.

Applying these standards to the facts of this case, the four corporate entities—Direct Benefits Group, Voice Net Global, Solid Core, and WKMS—operated as a common enterprise such that each is liable for the acts of the others.  The two individual Defendants were each sole owners and principals of two of the four corporate entities, were close working partners with each other, and were involved with one another's companies.  They and their companies operated out of the same office space in Bluffdale, Utah with common employees and shared equipment, and they worked together in enrolling customers in the discount programs via the payday loan websites.

The corporate entities worked cooperatively and complemented one another in inducing consumers to enroll in the discount club products.  WKMS operated the payday loan application websites where consumers became enrolled in the discount clubs of Direct Benefits Group and Voice Net Global, and Solid Core supplied employees and operational, administrative, and technological services to Direct Benefits Group, Voice Net Global, and WKMS.  See Network Servs. Depot, 617 F.3d at 1143 (finding common enterprise where "companies pooled resources, staff, and funds; they were all owned and managed by [same owner] and his wife; and they all participated to some extent in a common venture to sell internet kiosks"); Wash. Data Res., 856 F. Supp. 2d at 1271-72 (finding common enterprise where entities had common employees and officers, commingled funds, shared advertising, and "failed to recognize a distinct corporate demarcation between each company").

Although WKMS's payday loan websites could have operated–and, for a time,

apparently did operate—without the discount club "upsells" being included on them, this circumstance does not prevent WKMS from being part of the common enterprise involving the discount clubs.  The payday loan websites played an integral role in the discount club enrollment process.  Moreover, the messages on the websites during the enrollment process blurred the two types of products and the offerors of those products.  For example, after a loan application was submitted and the "OK" button was clicked, a message appeared stating that "[w]e are currently finding the best lender match for your loan application" and that the applicant should "review our email that will be sent to you" and "check your inbox and spam folder."  (Pl.'s Ex. 35 at B6).  Although the message suggests that an email regarding the payday loan was forthcoming, the email referenced in this message was instead an email from one of the discount clubs.  The entities—including WKMS—all worked together as part of the enterprise, and WKMS is liable as well.  Cf. FTC v. Ivy Capital, Inc., No. 2:11-CV-283 JCM(GWF), 2013 WL 1224613, at *13-14 (D. Nev. Mar. 26, 2013) (finding corporate entity liable where it "furthered [other entity] in the execution of its scam"; "[t]he roles of each entity varied, but all had a distinct role to play as part of the scam," and entities shared address and had common partners and officers and money flowed among them).  Accordingly, WKMS's ore tenus motion (Doc. 206) for judgment on partial findings—made on the third day of trial—is denied.[10]

---

[10]After the FTC rested its case, Defendants Wood, Berry, WKMS, and Solid Core moved ore tenus for a judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c).  (See Doc. 206; Tr. Day 3 at 10).  This rule provides in pertinent part that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding

In sum, considering the operation of the companies as a whole, all four functioned as a common enterprise with regard to enrollment of consumers in the discount clubs and debiting of their bank accounts.  Thus, each entity is responsible for the acts of the others.

X.  Individual Liability

The FTC also seeks to hold Wood and Berry individually liable for the § 5(a) violations of the corporate entities.  In order to establish individual liability under the FTCA—including liability for monetary equitable relief—"'the FTC must show that the individual defendants participated directly in the practices or acts or had authority to control them . . . . The FTC must then demonstrate that the individual had some knowledge of the practices.'" FTC v. Gem Merch. Corp., 87 F.3d 466, 470 (11th Cir. 1996) (alteration in original) (quoting FTC v. Amy Travel Serv., Inc., 875 F.2d 564, 573 (7th Cir. 1989)); accord Nat'l Urological Grp., 645 F. Supp. 2d at 1206-07; Ivy Capital, 2013 WL 1224613, at *15 ("It is appropriate to impose equitable monetary relief against a defendant if . . . the individual had some knowledge of the company's deceptive acts or practices.").  The FTC established these elements in this case as to Defendants Wood and Berry, and accordingly both are individually liable for the violations by the corporate entity Defendants.

First, although the FTC need only show either authority to control or direct participation in the subject practices, both have been established here.  "Authority to control the company can be evidenced by active involvement in business affairs and the making of

---

on that issue."  I denied the motion as to Defendants Wood, Berry, and Solid Core and took it under advisement as to WKMS. (See Doc. 207; Tr. Day 3 at 16-17).  As set forth in the text, that motion is now denied insofar as it pertains to WKMS as well.

corporate policy, including assuming the duties of a corporate officer." Amy Travel, 875 F.2d at 573.  By their own testimony, Wood and Berry were actively involved in the affairs of these businesses that they formed and managed.  Additionally, they acknowledged their direct participation in the subject activities.  Wood wrote the text for the pop-up boxes, and Berry implemented the text and provided the technological expertise.

Second, Wood and Berry clearly had knowledge of the practices at issue. "Individuals possess the requisite knowledge if they: (1) had actual knowledge of the representations; (2) were recklessly indifferent to the truth or falsity of the misrepresentations; or (3) had an awareness of a high probability of deceptive conduct together with an intentional avoidance of the truth." Ivy Capital, 2013 WL 1224613, at *15. The evidence overwhelmingly shows that Wood and Berry knew of the contents of the websites—indeed, they created those contents—and that they knew of the probability and fact of deception.

Wood and Berry have asserted that they should not be held individually liable because they relied on advice of counsel and acted in good faith by seeking and obtaining such advice.  Prior to trial, however, I granted the FTC's motion to strike the defense of reliance on advice of counsel, noting that "reliance on advice of counsel is not a valid defense on the question of knowledge required for individual liability." (Order, Doc. 199, at 7 (quoting Cyberspace.com, 453 F.3d at 1202 (internal quotations omitted))).  Furthermore, I reject Wood and Berry's contention that they must have acted in bad faith in order to be held personally liable.  See Commerce Planet, 878 F. Supp. 2d at 1084 ("As a matter of law, advice of counsel and good faith are not defenses to whether the defendant had the

requisite knowledge under section 5(a). . . . Good faith is . . . irrelevant to the question of knowledge.").

Thus, the FTC has established a basis for the imposition of both injunctive relief and monetary equitable relief against the individual Defendants along with the corporate entities.

## XI.  Remedies

The FTC seeks both a permanent injunction and monetary equitable relief against the Defendants.  As set forth below, I conclude that both of these requested remedies are appropriate in this case.

### A.  Permanent Injunction

Under § 13(b) of the FTCA, the FTC "may seek, and after proper proof, the court may issue, a permanent injunction."  15 U.S.C. § 53(b).  "[P]ermanent injunctive relief is appropriate if 'the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future.'"  FTC v. USA Fin., LLC, 415 F. App'x 970, 975 (11th Cir. 2011) (quoting SEC v. Caterinicchia, 613 F.2d 102, 105 (5th Cir. 1980)).  "The Court examines the totality of the circumstances involved and a variety of factors in determining the likelihood of future misconduct."  Commerce Planet, 878 F. Supp. 2d at 1086. "Nonexhaustive factors include the degree of scienter involved, whether the violative act was isolated or recurrent, whether the defendant's current occupation positions him to commit future violations, the degree of harm consumers suffered from the unlawful conduct, and the defendant's recognition of his own culpability and sincerity of his assurances, if any, against future violations."  Id.

Here, the violative acts took place over a two-year period, and consumers suffered

significant harm.  Additionally, the evidence reflects that although Defendants had ceased the operation of the discount club upsells shortly prior to the receiver's arrival, they still had the ability to restart the operation at any time.  Moreover, the Defendants have not recognized their culpability for these acts, and their awareness of complaints and their expectation of a significant number of returns—including significant returns for insufficient funds—demonstrates their state of mind.  Under these circumstances, a permanent injunction is warranted.

B.  Equitable Monetary Relief

In addition to a permanent injunction, the FTC seeks equitable monetary relief.  The Eleventh Circuit has recognized that § 13(b) grants courts authority to impose "the full range of equitable remedies, including the power to grant consumer redress and compel disgorgement of profits."  Gem Merch., 87 F.3d at 468.  "Section 13(b) plays an important role in enabling the FTC to enforce consumer protection laws.  Accordingly, disgorgement, the purpose of which 'is not to compensate the victims of fraud, but to deprive the wrongdoer of his ill-gotten gain,' is appropriate."  Id. at 470 (quoting SEC v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978)).

Earlier this year, the Eleventh Circuit squarely held that "the amount of net revenue (gross receipts minus refunds), rather than the amount of profit (net revenue minus expenses), is the correct measure of unjust gains under section 13(b)."  FTC v. Wash. Data Res., 704 F.3d 1323, 1327 (11th Cir. 2013).  At trial, the FTC established—and Defendants, through Wood, acknowledged—that the amount of Defendants' gross receipts was $35,628,176 and that returns, chargebacks, and refunds totaled $26,116,004—resulting in

a net revenue amount of $9,512,172.  (See Pl.'s Ex. 33; Tr. Day 3 at 125-29 (Wood Test.)).

Thus, equitable monetary relief of $9,512,172 is appropriate, and Defendants shall be jointly

and severally liable for this amount.

### XII.  Conclusion

For the foregoing reasons, I find in favor of the FTC and against all of the Defendants

on both counts of the Complaint for unfair and deceptive practices under § 5(a) of the FTCA.

The Defendants acted as a common enterprise, and the individual Defendants are also

liable for the violations of the corporate entities.  The FTC established entitlement to

permanent injunctive relief and to disgorgement of $9,512,172.

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1.  Defendant WKMS, Inc.'s ore tenus Motion for Judgment on Partial Findings (Doc.

206) is **DENIED.**

2.  **No later than Monday, July 29, 2013**, the FTC shall submit[11] a proposed

judgment and a proposed permanent injunction that complies with Federal Rule of Civil

Procedure 65(d).

**DONE** and **ORDERED** in Orlando, Florida, this 18th day of July, 2013.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record

----

[11]The proposals shall be filed in the electronic record and also emailed to chambers, preferably in WordPerfect format.